USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  9/30/20_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

| | |
|---|---|
| KEYSTONE FOOD HOLDINGS LIMITED (n/k/a BEEF HOLDINGS LIMITED), | : |
| | : |
| | : |
| **Plaintiffs,** | : |
| -against- | : |
| | : |
| TYSON FOODS, INC., | : |
| **Defendants.** | : |
| | : |
| | : |
| | . |

**1:19-cv-3888 (ALC)**

<u>**OPINION AND ORDER**</u>

------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

This is a multi-billion-dollar dispute between two highly sophisticated parties. The conflict arises from the negotiated sale of Plaintiff Keystone Foods Holdings Limited (n/k/a Beef Holdings Limited) to Defendant Tyson Foods, Inc.

The instant motion is Tyson's motion to compel arbitration and stay proceedings with respect to Counts I–IV and VI of the Complaint and to dismiss Counts V and Counts VII–X. For the reasons that follow, that motion is GRANTED.

## BACKGROUND

Prior to the sale at issue in this matter, Marfrig Global Foods S.A. ("Marfrig") owned and operated Keystone Food Holdings Limited through its wholly owned subsidiary, Beef Holdings. (Compl. at ¶ 18). Keystone is a leading supplier of poultry in the United States and the Asia-Pacific region. (*Id.*) In 2013, Marfrig decided to sell Keystone through a two-phase auction. (*Id.* at ¶ 24). Approximately thirty potential bidders participated in the first phase of the auction, nine submitted bids, and five advanced to phase two. (*Id.*) Tyson was one of the advancing five.

On June 29, 2018, the closing date of phase two, Tyson submitted a bid to Marfrig setting the Purchase Price of Keystone at $2.32 billion. (*Id.* at ¶ 26). On July 10, 2018, Tyson improved its bid to $2.4 billion based on an earnings before income, tax, depreciation, and amortization "multiple of 10.3, less $175 million in anticipated pricing adjustments, for a net price of $2.25 billion." (*Id.*) Tyson's offer valued Keystone's U.S. operation at $1.6 billion, whereas a competing bidder interested only in purchasing Keystone's U.S. operation, allegedly had "expressed a desire to buy Keystone's U.S. (but not tis Asia Pacific operations) at a price between $1.6 billion and $1.75 billion." (*Id.* at ¶ 27).

The parties engaged in subsequent in-person negotiations, in which Tyson's CEO offered to buy all of Keystone, valuing its U.S. operation at $1.8 billion in exchange for Marfrig's agreement to stop negotiating with the competing bidder. (*Id.* at ¶ 28). The parties orally agreed to these terms. (*Id.*) Four days later, on July 20, 2018, Tyson sent Marfrig a "Revised Proposal to purchase Keystone's global operations for "$2.7 billion, less $200 million in pricing adjustments for 'certain agreed allowances,' for a net price of $2.5 billion." (*Id.* at ¶ 29). In this letter, Tyson stated it was "prepared to acquire" Keystone for that price "with no further deductions." (*Id.*; ECF No. 38-2 at 2–3). The letter does not commit the parties to enter into the transaction but reflects their agreement "to negotiate in good faith." (ECF No. 38-2 at 2–3). The letter also grants Tyson an exclusive 15-day period, until August 4, 2018, to complete the transaction." (*Id.*; Compl. at ¶ 29). "[T]he parties agreed to a target signing date on or before August 6, 2018." (Compl. at ¶ 30).

According to Plaintiff, Tyson stalled the signing date. (*Id.* at ¶ 32). The parties reconvened on August 13, 2018 "to hammer out the final details of the transaction," but allegedly, "price was not on the list of issues for discussion, nor was it ever mentioned during the meeting." (*Id.*)

On August 15, 2018, the parties met again at Tyson's request. (*Id.* at ¶¶ 34–35). In that meeting, Tyson ultimately demanded a $330 million discount on the previously set Purchase Price. (*Id.* at ¶ 37). Having committed to shareholders that it would deleverage its balance sheet through the sale of Keystone by the end of the year," and having backed out of negotiations with other interested parties, Marfrig felt it had limited options and decided to move forward with the sale. (*Id.* at ¶ 38). The parties signed a Stock Purchase Agreement ("SPA") at the revised $2.37 billion Purchase Price on August 17, 2018. (*Id.* at ¶ 39).

Under the SPA, Beef Holdings and Tyson made several representations and warranties to one another. (SPA § 3). The SPA provides that "[e]xcept for fraud…the sole and exclusive remedy of Buyer or Seller…after Closing for any breaches of or inaccuracy of any representation, warranty, covenant or agreement of Seller of Buyer, respectively, [t]herein or any other breach of or claim under this Agreement" shall be "the rights to indemnification provided for in…Article 9." (SPA § 9.3.6). The SPA provides that the parties are not liable to one another for losses under $16.2 million and caps liability at $215.6 million. (*Id.* at §§ 9.3.1, 1.1 at 2, 5). The parties should "proceed in good faith" to resolve an indemnity dispute, but where resolution through negotiation is not possible, "such dispute shall be resolved by litigation in an appropriate court of competent jurisdiction in accordance with Section 11.13." (SPA § 9.5.4). In § 11.13, the

parties "submit to the exclusive jurisdiction of the courts of the State of New York and the Federal courts of the United States of America located in the State, City and County of New York…" (SPA § 11.13).

Section 11.13 additionally dictates that "[n]otwithstanding anything to the contrary contained in [the] Agreement…any and all matters or disputes under this Agreement with respect to IFRS compliance shall be finally determined by the members of the national office of Grant Thornton LLP that have not previously worked for Seller, Buyer or any of their respective Affiliates." (SPA § 11.13).

The SPA bars double recovery, stating that: "For the avoidance of doubt, no Indemnified Party shall be compensated more than once for the same Loss." (SPA § 9.3.3).

The SPA provides a four-step process through which to calculate the Purchase Price. First, Beef Holdings submits an Estimated Statement at least two days before Closing, calculating five categories of Purchase-Price Adjustments and the resulting Estimated Purchase Price. (*Id.* § 2.3.3). The five adjustment categories and resulting Estimated Purchase Price are to be determined in accordance with "Accounting Principles" as defined in the SPA. (*Id.* § 2.3.3). Under the SPA:

> "Accounting Principles" means: (i) IFRS [International Financial Reporting Standards] in effect as of the date hereof; and (ii) to the extent not inconsistent with (i), [IFRS] the accounting methods, practices, procedures and policies used in preparation of the Financial Statements, including the reporting period closing dates, consistently applied.

(*Id.* § 1.1 at 1). "'Financial Statements' has the meaning given in Section 3.7 of the SPA," (*Id.* § 1.1 at 6). Section 3 of the SPA is the Representations and Warranties section of the agreement. Section 3.7 provides that Seller will be required to provide

Buyer with "financial statements…for the periods ended December 30, 2017…(the 'Financial Statements') and December 31, 2016, and the unaudited master book financial statements…used to prepare the consolidated financial statement…for the periods ended March 31, 2018 and June 30, 2018 (the 'Master Book Statements')." (*Id.* § 3.7). Section 3.7 warrants that the Financial Statements were prepared "in accordance with IFRS and on the basis of the accounting principles, consistently applied, throughout the periods indicated." (*Id.*). In other words, the Estimated Purchase Price and the underlying adjustment categories must comply with IFRS and also, to the extent not inconsistent with the IFRS, with the same accounting procedures and policies Beef Holdings used to prepare the Financial Statements it represented and warranted to Tyson were accurate and IFRS-compliant.

The SPA further provides that specific adjustment categories should be calculated according to specific calculations provided in a Disclosure Schedule. Relevant here, the SPA states that "Indebtedness…shall be calculated pursuant to, and on the same basis of, Section 1.1(A) of the Disclosure Schedule, which contains a sample calculation of the Indebtedness of [Beef Holdings] as of June 30, 2018." (SPA § 1.1 at 7–8). Similarly, "Quasi-Indebtedness" shall be calculated pursuant to "Section 1.1(D) of the Disclosure Schedule, which contains a sample calculation of the Quasi-Indebtedness of [Beef Holdings] as of June 30, 2018.

"Working Capital" is "the consolidated balance of the asset accounts…listed on Section 1.1(F) of the Disclosure Schedule minus the consolidated balance of the liabilities accounts…listed on Section 1.1(F) of the Disclosure Schedule…which contains a sample calculation of Working Capital…as of June 30, 2018." (*Id.* § 1.1 at 15).

Tyson had two days to submit written objections to the Estimated Purchase Price and its underlying calculations.

Second, within 60 days of Closing, Tyson delivers a Closing Statement containing its Purchase Price Adjustment calculations and its resulting Purchase Price. (*Id.* at § 2.4.1). Third, Beef Holdings delivers an Objection Notice, responding to the Closing Statement and identifying "those items or amounts as to which [Beef Holdings] disagrees." (*Id.* at § 2.4.2). "[D]uring the 15 days following delivery of the Objection Notice," the parties must "use their reasonable best efforts to reach agreement on the disputed items or amounts." (*Id.* at § 2.4.3). Fourth, if the parties are unable to resolve the disputed items or amounts, they must "cause the members of the national office of KPMG…(the 'Accounting Firm'), promptly to review [the SPA] and the disputed items or amounts for the purpose of calculating the Purchase Price." (*Id.* at § 2.4.3). Within 30 days of the referral, KPMG is to deliver "a report setting forth such calculations and reasonably detailed explanations of each required adjustment, including the basis thereof." (*Id.*) "The Accounting Firm's determination shall be final and binding upon Seller and Buyer, and absent manifest error, shall be deemed a final arbitration award that is binding on Buyer and Seller." (*Id.* at § 2.4.4). The Final Purchase Price is defined by the SPA to be either the price mutually agreed to by Buyer and Seller or "in the absence of such agreement, the Purchase Price determined by the Accounting firm." (*Id.* at § 2.4.5).

On November 27, 2018, Beef Holdings submitted its Estimated Statement, calculating the Estimated Purchase Price to be $1,382,323,205. (Compl. at ¶ 67). Tyson submitted no objections, and the transaction closed on November 30, 2018. (*Id.* at ¶¶ 67,

72). On January 29, 2019, Tyson submitted its Closing Statement. (*Id.* at ¶ 68). Tyson

made adjustments to Working Capital, Indebtedness, and Quasi-Indebtedness, all of

which resulted in a $232 million reduction to the Estimated Purchase Price. (*Id.*) Beef

Holdings objected to nine adjustments made by Tyson and eight of these disputes remain.

(*Id.* at ¶ 68; Pl. Br. at 9). The disputed adjustments ("Challenged Adjustments") are listed

in the table below.

**Table 1 – Challenged Adjustments**

|   | Name | Adjustment Category Impacted | Amount |
|---|------|------------------------------|--------|
| 1 | US Customer Accounts Receivable | Working Capital | $13.4mm |
| 2 | Non-Qualified Deferred Compensation | Working Capital | $6.0mm |
| 3 | Target Working Capital Increase | Working Capital | $15.0mm |
| 4 | Treatment of Leased Equipment | Indebtedness | $116.6mm |
| 5 | China JV | Indebtedness | $13.6mm |
| 6 | Asset Retirement Obligations | Quasi-Indebtedness | $4.9mm |
| 7 | Georgia Debt Service | Quasi-Indebtedness | $1.6mm |
| 8 | Change-of-Control Payments | Transaction Expenses | $2.5mm |
|   | **Total** | | **$173.7 mm** |

The parties were unable to resolve their disputes regarding the Challenged

Adjustments. Tyson insisted that all disputes belonged in front of KPMG for arbitration.

Beef Holdings refused to arbitrate and commenced this action on April 15, 2018 in the

Supreme Court of New York. (ECF No. 1). On April 29, 2019, Tyson submitted the

Purchase Price Adjustment disputes to KPMG for resolution. (ECF No. 49-8). Tyson

removed Beef Holdings' action to federal court. (ECF No. 1-1).

In Counts I through IV of its complaint, Beef Holdings alleges claims for breach

of contract, challenging the merits by which Tyson reached its calculations with respect

to Challenged Adjustments One, Two, and Four through Eight. In Count V, Beef

Holdings alleges that Tyson breached the parties' contract by adjusting the Target

Working Capital calculation (Challenged Adjustment Three), as the SPA prevented Tyson from making such an alteration in its Closing Statement. (Compl. at ¶¶ 161–68).

In Count VI, Beef Holdings alleges that Tyson breached the SPA by failing to provide with its Closing Statement "supporting documentation and papers reasonably necessary for [Beef Holdings] to understand and evaluate the Closing Statement" as required by SPA § 2.4.1. (*Id.* at ¶¶ 169–75) (quoting SPA § 2.4.1).

Beef Holdings concedes that the Court does not have jurisdiction over Challenged Adjustments Seven and Eight (Count III), which must be resolved in arbitration by KPMG pursuant to SPA § 2.4.3.

Counts VII through IX allege, respectively, breach of the implied covenant of good faith and fair dealing (Count VII), promissory fraud (Count VIII), and fraudulent inducement (Count IX). (*Id.* at ¶¶ 176–203). Count X seeks a declaratory judgment that Challenged Adjustments One through Six are not Purchase Price Adjustments within the jurisdiction of KPMG, Challenged Adjustments Two, Four, Five, and Six are IFRS-compliance disputes that must be resolved by Grant-Thornton under Section 11.13 of the SPA; [t]here can only be one KPMG proceeding pursuant to Section 2.4.3 of the SPA, which cannot commence until resolution of which disputed issues are within KPMG's jurisdiction;" After the court resolves the scope of KPMG's jurisdiction, "Tyson is prohibited from submitting any disputes to KPMG until it has satisfied its obligations to deliver the supporting documentation for its Closing Statement;" and "Beef Holdings is excused from further performance under the SPA." (*Id.* at ¶ 219).

Tyson now moves to compel arbitration and stay the proceedings with respect to Counts I–IV and VI of Beef Holdings' Complaint, and to dismiss Counts V, VII–X pursuant to Fed. R. Civ. P. 12(b)(6). (Defs. Br.).

## DISCUSSION

**I. Arbitration**

The crux of the arbitration dispute concerns Challenged Adjustments One, Two, Four, Five, and Six. Beef Holdings concedes that Challenged Adjustments Seven and Eight (Count III) should be before KPMG and Tyson concedes that Adjustment Three (Count V), does not belong in Purchase Price Adjustment arbitration. (Def. Br. at 9 n. 4). I lay out only the disputed Challenged Adjustments in more detail here.

*Challenged Adjustment One (US Customer Accounts Receivable).* Tyson reduced Working Capital by $13.4 million, citing an outstanding customer balance that Beef Holdings accounted for as a receivable. Tyson asserted the reduction was warranted as Beef Holdings had agreed to waive the amount it was owed by this customer. (Compl. at ¶ 107).

*Challenged Adjustment Two (Non-Qualified Deferred Compensation).* Tyson also decreased working capital by $6 million for "Exposure associated with 409A non-compliance." (ECF No. 49-3 at 4). Beef Holdings understands this adjustment to be based on Tyson's belief that Beef Holdings owes employees non-qualified deferred compensation payments as it has failed to comply with Section 409A of the Internal Revenue Code. (Compl. at ¶ 108).

*Challenged Adjustment Four (Treatment of Leased Equipment).* Tyson increased Indebtedness by $116.6 million on the basis that Beef Holdings had classified

improperly several equipment financing leases as operating leases on its financial statements. Under applicable accounting principles, financing leases affect Indebtedness and operating leases do not. (Compl. at ¶ 109; Def. Br. at 8).

      ***Challenged Adjustment Four (China JV).*** Tyson also increased Indebtedness by $13.6 million to include a portion of a shareholder loan to a Chinese joint venture in which Keystone is a 60% owner. (Compl. at ¶ 91).

      ***Challenged Adjustment Six (Asset Retirement Obligations).*** Finally, Tyson increased Quasi-Indebtedness by $4.9 million, citing "long-term asset-retirement obligations for which Beef Holdings had failed to reserve in contravention of applicable accounting principles." (Def. Br. at 8–9).

      Beef Holdings believes that all five of these purported adjustments "are predicated entirely on an alleged breach of one or more of Beef Holdings' pre-Closing representations and warranties, set forth in § 3 of the SPA." (Compl. at ¶ 106). Because § 9 of the SPA provides that the sole remedy for representation-and-warranty violations is indemnification, and that breaches of representations and warranties must be decided by a court of competent jurisdiction, Beef Holdings insists that these disputed Challenged Adjustments fall within this court's jurisdiction.

      With respect to the U.S. Customer Accounts Receivable Adjustment, Beef Holdings points to its representation and warranty that "[e]ach Contract set forth or required to be set forth in…the Disclosure Schedule (each, a "Material Contract") is a valid and binding agreement…and in full force and effect" and none of the parties to the Contract "has provided any written notice of any intention to terminate or modify, any such Material Contract." (SPA § 3.10.2). Beef Holdings argues that Tyson's first

adjustment is predicated on the claim that Keystone waived its contractual right to this

$13.4 million payment, which effectively is a claim that Beef Holdings breached its

§ 3.10.2 warranty by modifying a Material Contract. (Pl. Br. at 21).

      Beef Holdings' position is that all remaining adjustments (Challenged

Adjustments Two, Four, Five, and Six) are predicated on claims that Keystone's

historical accounting practices, those used to calculate its Financial Statements and

Master Book Statements, violated IFRS. These claims, Beef Holdings argues, effectively

are allegations that Beef Holdings breached its representation and warranty that its

Financial Statements and Master Book Statements comply with IFRS. (SPA § 3.7). The

full text of this representation and warranty is provided below:

> Seller has provided to Buyer in the Data Room the audited consolidated financial
> statements of the Group Companies as at and for the periods ended December 30,
> 2017 (the "Balance Sheet Date") (the "Financial Statements") and December 31,
> 2016, and the unaudited master book financial statements of the Group
> Companies used to prepare the consolidated financial statements of Marfrig as at
> and for the periods ended March 31, 2018 and June 30, 2018 (the "Master Book
> Statements"). Except as set forth in Section 3.7 of the Disclosure Schedule, the
> Financial Statements have been prepared in accordance with IFRS on the basis of
> the same accounting principles, consistently applied, throughout the periods
> indicated, except as otherwise noted therein. The Financial Statements present
> fairly in all material respects in accordance with IFRS on the basis of the
> accounting principles, consistently applied, throughout the periods indicated, the
> consolidated financial position, results of operations, cash flows and changes in
> equity of the Group Companies as at their respective dates. Except as set forth in
> Section 3.7 of the Disclosure Schedule, the Master Book Statements have been
> prepared in accordance with IFRS for the inclusion in the consolidated financial
> statements of Marfrig. The Master Book Statements present fairly in all material
> respects, for the basis on which they were prepared and subject to the absence of
> notes thereon, the financial position, results of operations and cash flows of the
> Group Companies as at their respective dates.

      Although Beef Holdings believes all five disputed Challenged Adjustments are

subject to this Court's jurisdiction and cannot be arbitrated by KPMG, Beef Holdings

also contends that Four through Six concern IFRS compliance and accordingly, should be resolved by Grant Thornton if Tyson moved to compel arbitration to that accounting firm. In Beef Holdings' view, § 11.13 dictates that where contractual disputes—like alleged breaches of representations and warranties—concern IFRS compliance, those disputes, which would otherwise fall under this court's jurisdiction, should be resolved by Grant Thornton, and the sole remedy available should be indemnification.

Tyson argues that all Challenged Adjustments were correctly characterized as purchase price adjustment disputes, falling squarely within SPA § 2.4. Tyson's position is that none of these Challenged Adjustments are also claims of breach of representations and warranties. However, even if they could be characterized as both purchase price adjustment and representation and warranty breach claims, Tyson argues that § 2.4.3 controls and KPMG should arbitrate.

If Tyson is correct, Counts I-IV of the Complaint (Challenged Adjustments One, Two, Four, Five, and Six) are Purchase Price Adjustment disputes and must be submitted to KPMG for resolution. If Beef Holdings is right, Counts I through IV (concerning Challenging Adjustments Two, Four, Five, and Six) are alleged breaches of representations and warranties subject to this Court's jurisdiction. With respect to Challenged Adjustments Two and Four through Six, if I determine that Beef Holdings is right and these disputes are alleged breaches of representations and warranties, I must then perform a *subsequent* analysis to determine whether these disputes, properly before me currently, concern IFRS compliance and thus, should be referred to Grant Thornton.

For the reasons that follow, at the first step of my analysis I conclude that all disputed Challenged Adjustments should be in arbitration as opposed to under the

jurisdiction of this Court. Accordingly, I need not answer the secondary question of whether Challenged Adjustments Two, and Four through Six implicate IFRS compliance and demand referral to Grant Thornton.

## A. Legal Standards

"Where…a party unambiguously refuses to arbitrate, a court's role is limited to determining '(1) whether there exists a valid agreement to arbitrate at all under the contract in question…and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement.'" *HBC Solutions, Inc. v. Harris Corp.*, No. 13-cv-6327, 2014 WL 6982921, at *4 (S.D.N.Y. Dec. 10, 2014) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996). The parties do not dispute that they agreed to arbitrate certain matters pursuant to the SPA—relevant here—Purchase Price Adjustment disputes. The point of contention is whether the disputed Challenged Adjustments are Purchase Price Adjustments, falling within the scope of SPA § 2.4.3. In other words, whether the parties agreed to have KPMG arbitrate the disputed Challenged Adjustments.

"[T]he issue of an arbitration agreement's scope is governed by federal law," *Seed Holdings, Inc. v. Jiffy Intern AS*, 5 F.Supp.3d 565, 565 n.10 (S.D.N.Y. 2014) (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 48 (2d Cir. 1993), and the Federal Arbitration Act ("FAA") reflects a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). However, "the presumption of arbitrability" applies "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." *Granite Rock Co. v. Int'l Brotherhood of*

*Teamsters*, 561 U.S. 287, 302 (2010). Courts must apply "standard principles of contract interpretation to determine whether the arbitration agreement unambiguously 'cover[s] the dispute in question.'" *University Consultation and Treatment v. Local 1199 United Healthcare*, 2015 WL 9077249, at *2 (S.D.N.Y. Dec. 16, 2015).

For reasons explained below, I find that the parties' disputes can be characterized as Purchase Price Adjustments encompassed by § 2.4.3. However, because these disputes could also be classified as breaches of representations and warranties, as covered by Beef Holdings in briefing, ambiguity in the agreement exists.

Even when faced with such ambiguity, "[i]n determin[ing] whether a particular dispute falls within the scope of an agreement's arbitration clause…a court should classify the particular clause as either broad or narrow." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001). Narrow clauses "are limited 'to specific types of disputes'" and must be construed differently than broad arbitration clauses." *Cytec Industries, Inc. v. Allnex (Luxembourg) & S.C.A.*, No. 14-cv-1561, 2015 WL 3762592, at *7 (S.D.N.Y. May 15, 2015) (quoting *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 831 (2d Cir.1988)). "Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Louis Dreyfus Negoce S.A.,* 252 F.3d at 224 (internal quotations omitted).

Section 2.4.3 is a narrow arbitration clause. There is no indication that the parties intended "to submit to arbitration disputes of *any* nature or character." *Seed Holdings, Inc.*, 5 F. Supp.3d at 583 (emphasis in original) (quoting *McDonnell Douglas*, 858 F.2d at

14

832) (internal citation and quotation marks omitted). Rather, the parties intended KPMG to review and resolve only "disputed items or amounts for the purpose of calculating the Purchase Price." (SPA § 2.4.3).

Where the arbitration is narrow, as here, the question for the court is whether the parties' disputes are "'collateral issue[s],' or fall reasonably within the scope of the clause. In light of the FAA's strong policy favoring arbitration, "any doubts concerning the scope of the arbitrable issue should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. "Thus arbitration should be compelled unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute…[a]ccordingly, a court can compel arbitration where…[the] arbitration provision can be interpreted to encompass the parties' disputes." *Severstal U.S. Holdings, LLC*, 865 F.Supp. 430, 438–39 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).

**B. Disputed Challenged Adjustments**

In its Closing Statement, Tyson adjusted Beef Holdings' Estimated Purchase Price because it felt Beef Holdings had incorrectly calculated Working Capital, Indebtedness, and Quasi-Indebtedness, metrics for which the SPA provides the parties calculation formulas. Beef Holdings objected to these adjustments through the submission of an Objection Notice pursuant to § 2.4.2. As § 2.4.3 provides, "disputed items or amounts" raised by the Objection Notice should be sent to KPMG for resolution if the parties cannot resolve them on their own. (*Id.* § 2.4.3). The only limitation the SPA places on the types of disputes referred is that KPMG "shall consider only those items or amounts in the Closing Statement or Buyer's calculation of the Purchase Price as to

which the Seller has disagreed." (*Id.*) The Section imposes no other "explicit limits on the type of objection to the calculation of" these adjustment categories that are reviewable by KPMG. (*Id.*); *see Seed Holdings, Inc.*, 5 F. Supp.3d at 583–84; *Alstom General Electric Company*, 228 F.Supp.3d 244, 250 (S.D.N.Y. 2017). Thus, the disputed Challenged Adjustments were made pursuant to the SPA's Purchase Price Adjustment provisions and appear to fall squarely with the agreement's arbitration clause.

Beef Holdings does not argue explicitly that the disputed Challenged Adjustments do not implicate the calculations of these categories, the ultimate Purchase Price, or the purchase-price-adjustment process. Rather, Beef Holdings' position is that the SPA excludes from arbitration all adjustments predicated on alleged representation and warranty breaches. In support of this position, Beef Holdings primarily relies on the New York Court of Appeal's decision in the *Matter of Westmoreland Coal Co. v. Entech, Inc.* 100 N.Y.2d 352 (2003). *Westmoreland* involved a dispute arising "under a stock purchase agreement whereby Westmoreland Coal Company acquired all of the outstanding capital stock of several of Entech, Inc.'s coal mining subsidiaries (the Companies)." *Id.* at 354. The agreement included interim financial statements from Entech, which represented and warranted that they were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). *Id.* The parties calculated the Companies' net asset value based on these financial statements. *Id.* at 355. After the transaction closed, Entech provided Westmoreland with a closing certificate, which, pursuant to the agreement was "prepared on an accounting basis 'consistent with' the interim financial statements" and set forth Entech's calculation of the Companies' purchase price. *Id.* Westmoreland objected in accordance with the agreement's purchase

price adjustment provisions, claiming an adjustment in its favor because it asserted "many of the asset values in the closing date certificate allegedly did not comply with GAAP." *Id.*

The Agreement provided that if the parties were unable to resolve such objections regarding purchase price adjustments, their disputes would be submitted to an accounting firm for resolution. *Id.* at 356. Entech refused to submit to alternative dispute resolution. Entech's position was that "insofar as Westmoreland objected to asset values carried over from the interim financial statements to the closing date certificate for failure to comply with GAAP, consistently applied, its exclusive remedy was a lawsuit for breach of representation or warranty in a court of competent jurisdiction, as provided for by the Agreement's indemnification provision." *Id.* As here, the agreement provided that Entech was required to indemnify Westmoreland for all adverse consequences relating to any breach of representation or warranty, and that indemnification was the exclusive remedy for these types of breaches. Indemnification disputes were to be resolved in a court of competent jurisdiction. *Id.*

The court agreed with Entech, reversing the New York Supreme Court's decision to refer the disputes to ADR. The court acknowledged that "Westmoreland's objections related to accounting conventions, estimates, assumptions or asset values common to both the interim financial statements and the closing date certificate," but determined that reading the agreement "as a harmonious and integrated whole" compelled the conclusion that Westmoreland's objections "unambiguously fall within the Agreement's indemnification provisions, not its purchase price adjustment provisions." *Id.* at 358.

The court explained that the purchase price adjustments provisions did not independently call for GAAP compliance, the basis on which Westmoreland made its adjustments. Instead, the purchase price adjustment provisions required the closing certificate and inclusively, the asset values, to be prepared "'on a basis *consistent* with the preparation of the Interim Financial Statements.'" *Id.* (quoting the Agreement). The Agreement's representations and warranties required that the same Interim Financial Statements comply with GAAP. *Id.* 358–59. Any claim regarding GAAP compliance, the court reasoned, effectively challenged Entech's representations and warranties that its interim financial statements complied with GAAP. There was no independent basis in the purchase price adjustment provisions upon which to challenge the closing certificate's GAAP compliance.

Beef Holdings argues that, under *Westmoreland*, the disputed Challenged Adjustments are not arbitrable because they are tantamount to claims that Beef Holdings' historical accounting practices violated IFRS and modified a Material Contract, both of which would be breaches of representations and warranties Beef Holdings made to Tyson.

Although *Westmoreland* remains good law, as several judges in this District have explained, its analysis is altered significantly where the FAA is in play. Where there is a plausible interpretation of an arbitration clause encompassing the relevant dispute, compelling arbitration is the appropriate outcome.

For instance, in *Severstal U.S. Holdings, Inc. v. R.G. Steel, LLC.*, Judge Sweet considered a stock purchase agreement "provid[ing] for the purchase of three U.S.-based steel companies from SUSH [Severstal U.S. Holdings, LLC] by RG Steel." 865 F. Supp.

2d 430, 432 (S.D.N.Y. 2012). Under the agreement, SUSH represented and warranted that the "unaudited consolidated financial statements of the Company and its Subsidiaries as of December 31, 2010…have been prepared in accordance with GAAP, consistently applied throughout the periods indicated." *Id.* at 434 (quoting the agreement). The agreement provided that indemnification is the exclusive remedy for breaches of representations and warranties. *Id.*

Pursuant to the agreement, contested adjustments to the purchase price made by R.G. Steel in its closing statements were to be resolved by an independent accounting firm. The purchase price adjustment provisions defined "Net Working Capital" as follows:

> The difference between the Company's and the Subsidiaries' consolidated (A) accounts receivable…and inventories and (B) accounts payable…determined in accordance with GAAP…consistently applied and following the policies, procedure, principles and methods employed in preparing the Company's balance sheet as of December 31, 2010 included in the Financial Statements, and shall be calculated in the manner set forth on Schedule 1.04(b)(ii).

*Id.* at 433 (quoting agreement).

As here, the parties disputed whether certain contested adjustments were properly characterized as purchase price adjustments or claims of representation and warranty breaches. R.G. Steel made the contested adjustment based on its assertion that Severstal did not calculate Net Working Capital in the closing statements in accordance with GAAP and following the principles and methods used in preparing the December 31, 2010 financial statements, as it was required to do by the contractually-specified definition of Net Working Capital. *Id.* R.G. Steel argued that these adjustments were arbitrable as challenges to the calculation of Net Working Capital in the closing statement, *i.e.* purchase price adjustments. *Id.* Severstal argued that R.G. Steel's so-called

adjustments were alleged breaches of representations and warranties because they were "grounded on the notion that GAAP promises were violated…" *Id.*

Judge Sweet agreed with R.G. Steel's reasoning that there was a reading of the agreement permitting arbitration of the parties' disputes, and thus, the contested adjustments were arbitrable purchase price adjustments. *Id.* at 444. This interpretation of the agreement was bolstered by the fact that the R.G. Steel-Severstal agreement prohibited a party from recovering for the same "loss" via the indemnity remedy offered by the representation and warranties provisions and a purchase price adjustment. *Id.* at 443. Judge Sweet understood this double-recovery bar to "contemplate[] that a claim under the SPA can have a dual nature, such as those that are capable of being asserted as proposed post-closing adjustments or a claim for indemnification." *Id.* "[T]he parties agreed to have more than one avenue of redress." *Id.*

The similar double-recovery provision in the SPA is persuasive. It indicates the parties contemplated that certain losses could be pursued in different forums, pursuant to distinct portions of the SPA and did not choose to require such dual-natured claims to be framed in a particular way. The analysis in *Severstal* supports the conclusion that Tyson's contested adjustments are purchase price disputes that are arbitrable despite the possibility that they may also be framed as claims for breach of representations and warranties. *See id.*

*Severstal* is the post-*Westmoreland* case with an agreement most similar to the SPA. However, other post-*Westmoreland* federal cases addressing similar conflicts over whether to classify contested adjustments as purchase price adjustments or breaches of representations and warranties have emphasized similarly the significance of the FAA in

undermining the persuasiveness of *Westmoreland* in favor of the latter reading. *See HBC Solutions, Inc. v. Harris Corp.*, No. 13-CV-6327, 2014 WL 6982921, at *1 (S.D.N.Y. Dec. 10, 2014); *Alstom v. General Electric Co.*, 228 F.Supp.3d 244 (S.D.N.Y. 2017) ("there is plainly an interpretation…that covers the issues raised by Alstom in its Dispute Notice."); *Seed Holdings, Inc.*, 5 F.Supp.3d at 583.

Although very similar fact patterns, these cases have agreements that are distinguishable more easily from the agreement in *Westmoreland* than is the agreement here. For instance, the agreement in *Alstom* did "not make indemnification the exclusive remedy for claims that might otherwise fall within the scope its representation and warranties provisions…" 228 F.Supp.3d at 252. In fact, "the Agreement explicitly state[d] that all remedies under this Agreement…will be deemed cumulative with an not exclusive of any other remedy." *Id.* at 253. The agreement in HBC did contain an exclusive indemnification remedy provision; however, it also "explicitly carve[d] out…any disputes that are resolved pursuant to the Purchase Price Adjustment procedures…" 2014 WL 6982921 at *7.

Although these distinctions certainly make these cases easier to distinguish from *Westmoreland,* they do not undermine the significance and applicability of the decisions' emphasis on the controlling influence of the FAA.

Beef Holdings also contends that *Severstal* is distinguishable. In *Severstal*, Judge Sweet distinguishes the agreement before him from the agreement in *Westmoreland*, noting that the purchase price adjustments in his agreement, including the contested adjustments, were calculated based on financial statements as to which no representations were made. *Id.* at 440. "Thus, the purchase price is ultimately a function of the agreed-

upon calculation methodology that neither begins from nor ends is based upon the financial statements to which Severstal made representations." *Id.*

Beef Holdings argues that in the SPA, there is more overlap between the Purchase Price Adjustment provisions and the Representations and Warranties Section. In particular, Beef Holdings argues that in its definitions of the adjustment categories, including Working Capital, Quasi-Indebtedness, and Indebtedness, the SPA requires that these metrics be calculated pursuant to provisions in the Disclosure Schedule. The Disclosure Schedule's provisions, Beef Holdings argues, is crafted based on Master Book Statements of Beef Holdings from June 30, 2018. (Pl. Br. at 19). In the SPA, Beef Holdings made representations that these Master Book Statements, as well as Financial Statements of Beef Holdings for the periods ended December 30, 2017 and December 31, 2016, were prepared in accordance with IFRS on the basis of the same accounting principles, consistently applied, throughout the periods indicated." (SPA § 3.7). Accordingly, Beef Holdings stresses that the need for consistency prioritized in *Westmoreland* exists here as it did not in *Severstal*. (Pl. Br. at 19–20).

I do not see any basis for concluding that the definitions of or calculations for the Adjustment Categories is premised upon the Master Book Statements, however, I do think that there is more overlap between the Representation and Warranties Section and Purchase Price Adjustment provisions in the SPA than there were in the agreement in dispute in *Severstal*.

Under the Tyson-Beef Holdings SPA, the Estimated Purchase Price and all Estimated Purchase Price Adjustment categories are to be calculated pursuant to Accounting Principles. (SPA §§ 2.3.1, 2.3.3). As stated above, Accounting Principles are

defined, in part, in reference to "the accounting methods, practices, procedures and policies used in preparation of the Financial Statements…" (*Id.* § 1.1 at 1). "Financial Statements has the meaning given in Section 3.7." (*Id.* § 1.1 at 6). Section 3 is the Representations and Warranties Section of the SPA. (*Id.* § 3). Thus, it cannot be said that the Challenged Adjustments did not implicate documents about which representations or warranties were made. Here, there is a colorable argument that the disputed adjustments could be classified as both alleged representation and warranties breaches and purchase price adjustments.

A similar overlap existed in the contested agreement in *HBC Solutions, Inc*. In *HBC Solutions, Inc.*, Judge Furman considered an Asset Sales Agreement ("ASA") made between HBC Solutions, Inc. ("HBC") and the Harris Corporation ("Harris") through which Harris agreed to sell a portion of its business to HBC. 2014 WL 6982921, at *1.

In Section 4.9 of the ASA, "Harris represented and warranted that…its financial statements were 'prepared in accordance with the accounting records and policies of [Harris]' and with the…'U.S. GAAP'…and 'presented fairly in all material respects the assets and liabilities of the Business as of the dates thereof and the results of its operations for the periods then ended.'" *Id.* at *2 (quoting ASA § 4.9). The ASA "require[ed] Harris to indemnify and hold HBC harmless 'from and against…any misrepresentation, breach, or inaccuracy of any representation or warranty…'" *Id.* at *3 (quoting ASA § 11.1).

The ASA's purchase price adjustment provisions "included a multi-step process to adjust the purchase price based on the value of the Business's cash, indebtedness, and working capital as of the closing date." *Id.* at *2 (citing ASA §§ 3.1, 3.3). The provisions

required Harris first to draft a pre-closing certificate to HBC calculating these "amounts 'in accordance with U.S. GAAP and, to the extent consistent with U.S. GAAP, the accounting principles and methodologies followed by [Harris] in its preparation of its financial statements—defined in the Agreement as 'the Accounting Principles.'" *Id.* (quoting ASA § 3.1(b)).

Harris delivered the pre-closing certification. *Id.* at *3. HBC sent a Dispute Notice asserting that Harris misapplied U.S. GAAP and/or Harris accounting policies in conflict with the requirements of the ASA and the Accounting Principles. *Id.* HBC calculated Closing Working Capital to be more than $70 million less than what Harris had calculated the same figure to be. *Id.*

HBC argued the disputed adjustments were "purchase price adjustment disputes subject to resolution pursuant to Section 3.3 of the Agreement, including arbitration before the Accountant." *Id.* at *4. Harris maintained "that HBC's objections constitute claims for breach of representations and warranties…subject to the Agreement's indemnification provisions…" *Id.*

Concluding that HBC's reading of the ASA compelling arbitration was "plausible," Judge Furman reasoned that the FAA required adopting HBC's interpretation of the objections as purchase price adjustment disputes. *Id.* at *5. In reaching this conclusion, Judge Furman emphasized that the ASA does not limit the types of disputes raised in the Dispute Notice that should be referred to arbitration, indicating that any conflicts raised properly pursuant to the purchase price adjustment process fall within the scope of the arbitration clause. *Id.*

The purchase price adjustments in the ASA in Judge Furman's case required that adjustment categories be "prepared in accordance with the Accounting Principles," defined by the ASA to mean "in accordance with U.S. GAAP and, to the extent consistent with U.S. GAAP, the accounting principles and methodologies followed by [Harris] in its preparation of its financial statements." *Id.* at *2 (internal citation omitted). Harris made representations and warranties that those financial statements complied with GAAP. *Id.* As discussed above, the SPA is set up similarly. The purchase price provisions demand compliance with Accounting Principles, meaning IFRS compliance, and to the extent not inconsistent with IFRS, consistent with the methods and practices used in preparation of the Financial Statements to which Beef Holdings made representations and warranties. (SPA at § 1.1 at 1).

From this contractual structure, Judge Furman reasoned that the Accounting Principles and the Financial Statements are distinct metrics, and that this distinction is critical. Although the Accounting Principles may subsume the Financial Statements, they are not derived from these Statements, as they independently require GAAP compliance and only consistency with the Financial Statements' methodology as is not inconsistent with GAAP. Thus, where in *Westmoreland*, it was impossible to understand the seller's objections outside of the representations and warranties provisions of the agreement, here, the purchase price adjustment provisions provide an independent basis—the Accounting Principles—for challenging compliance with GAAP. The same analysis applies here, lending even more support to the interpretation of the SPA as allowing for certain dual action claims that can be framed as either purchase price adjustment disputes or alleged breaches of representations and warranties.

Because there is a plausible interpretation of the SPA that encompasses all disputed Challenged Adjustments as purchase price adjustments, the FAA requires that I grant Tyson's motion to compel and submit these claims to KPMG for resolution.

**B. Supporting Documentation**

Tyson also moves to compel to arbitration Count VI of the Complaints, Beef Holdings' claim that Tyson breached the SPA by failing to provide with its Closing Statement "supporting documentation and papers reasonably necessary for [Beef Holdings] to understand and evaluate the Closing Statement" as required by SPA § 2.4.1. (*Compl.* ¶¶ 169–75); *see* (Defs. Br. at 20–21).

Section 2.4.1 of the SPA is a purchase price adjustment provision. The Closing Statement and supporting documentation Tyson is required to provide hereunder is meant to assist the Beef Holdings in evaluating Tyson's calculation of the various adjustment categories and the resulting purchasing price. (SPA § 2.4.1). The KPMG arbitration provision is narrow, but instructs that all "disputed items or amounts for the purpose of calculating the Purchase Price" should be resolved by arbitration (*Id.* § 2.4.3). The review of the documents underlying substantive adjustment calculations necessarily calls into review the merits of the calculations themselves. Again, reading the provision through the lens of the FAA, there is a plausible interpretation that it encompasses disputes as to the adequacy of Closing Statement documentation relevant to Purchase Price calculation. Accordingly, this claim is referred to KMPG for resolution as well.

## II. Dismissals

## A. Legal Standards

"To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ' " *Zoulas v. New York City Dep't of Education*, 400 F. Supp.3d 25, 47 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 566). In "[d]etermining whether a complaint states a plausible claim…[t]he court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Gillespie v. St. Regis Residence Club, New York Inc.*, No. 16-cv-9390, 2019 WL 4747185, at *4 (S.D.N.Y. Sept. 30, 2019), citing *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

"In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to 'facts stated on the face of the complaint,' 'documents appended to the complaint or incorporated in the complaint by reference,' and 'matters of which judicial notice may be taken.'" *Zoulas*, 400 F. Supp. 3d at 48 (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).

In addition to requirements of Rule 12(b)(6), a complaint "alleging fraud must satisfy the heightened pleading requirements of Rule 9(b) by stating the circumstances constituting fraud 'with particularity.'" *Pilkington North America, Inc. v. Mitsui Sumitomo Ins. Co. of America*, 2020 WL 2521562, at *5 (S.D.N.Y. May 18, 2020).

However, the "heightened particularity requirement does not apply to allegations regarding fraudulent intent, also known as scienter, which may be alleged generally." *Id.* (quoting *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 511 (S.D.N.Y. 2016)).

## B. Fraud

To state a claim for fraud under New York law, "a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'" *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (1996)); *see Globaltex Group, Ltd. v. Trends Sportswear, Ltd.*, 2009 WL 1270002, at *6 (S.D.N.Y. May 6, 2009) (stating promissory elements).

Beef Holdings alleges that Tyson made a fraudulent misrepresentation in its July 20, 2018 Revised Proposal when it promised to "'negotiate in good faith'" an agreement to acquire Keystone for $2.7 billion, less a specified amount of agreed allowances, '*with no further deductions*.'" (Compl. at ¶ 185) (emphasis in original). In relevant part, Tyson wrote:

> Tyson is prepared to acquire the Business…at a valuation of USD 2.7 billion *minus* USD 200 million for certain agreed allowances, with no further deductions…This Revised Proposal is not intended to, nor does it, constitute a binding obligation on the part of Marfrig or Tyson to enter into the Proposed Transaction and solely reflects the parties' intention to negotiate in good faith a transaction on the terms set forth herein and with such other terms as the parties may agree. Any such commitment will only be binding when definitive written agreements therefor are executed and delivered
> by the parties.

(ECF No. 38-2 at 2–3).

Keystone alleges these misstatements were "fraudulent because, at the time it signed the July 20, 2018 Revised Proposal, Tyson had a present and undisclosed intent to negotiate in good faith" and "not to acquire Keystone for $2.7 billion with no further reductions in price. (Compl. ¶¶ 187). Tyson "intended to deceive Beef Holdings and, through that deception, induce Beef Holdings to stop negotiating with the Other Bidder." (*Id.* ¶¶ 188).

Tyson's intent or lack thereof allegedly was demonstrated "when Tyson demanded a $330 million discount on the agreed-upon price" despite there having been "[n]o change in circumstances, disagreement over deal terms, or change in the general economy…plausibly explaining Tyson's abrupt reversal." (*Id.* ¶¶191). Additionally, although the parties allegedly circulated numerous drafts of the SPA following the July 20 letter, "Tyson never once identified the Purchase Price as an issue that remained in question." (*Id.* ¶ 192).

Beef Holdings alleges it relied on this material misrepresentation when it "agreed to exclusively negotiate with Tyson and walked away from negotiations with the Other Bidder, who had expressed an interest in acquiring Keystone's U.S. operation for up to $1.75 billion." (*Id.* ¶¶ 190).

Beef Holdings' position is that the Revised Proposal was a Type II agreement, one of two types of preliminary agreements the Second Circuit has held creates a binding obligation. *EQT Infrastructure Ltd. v. Smith*, 861 F.Supp.2d 220, 226 (S.D.N.Y. 2012). "Type II agreements are 'binding only to certain major terms, but leaving open other terms for negotiation.'" *Id.* at 227 (quoting *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). Beef Holdings argues that the Revised Proposal was a Type II agreement

obligating the parties to negotiate in good faith, although the agreement did not bind the parties to a particular purchase price or to even go forward with the ultimate transaction. By ultimately conditioning the closing of the transaction on a massive reduction in purchase price, Tyson allegedly violated its *contractual* obligation to negotiate in good faith.

Typically, in a scenario like this, a party in Beef Holdings' position would have sued Tyson for breach of this Type II contract. However, Beef Holdings instead chose to agree to Tyson's allegedly bad-faith terms and sign a new agreement, the SPA, which contains an integration clause, expressly disclaiming reliance on any prior documents or agreements, including the Revised Proposal. (SPA § 11.3). Thus, Beef Holdings is barred from claiming that breach of contract regarding the Revised Proposal. Beef Holdings also cannot assert fraud with respect to the ultimate agreement, as it signed the SPA with knowledge of Tyson's alleged bad faith.

Accordingly, Beef Holdings now tries to bootstrap a contract claim regarding an effectively defunct, non-binding agreement into a fraud claim that concerns only the original, contractually inoperative Revised Proposal. The court is aware of no case and Beef Holdings cites no case in which a fraud claim alleged in these circumstances survived.

Even if the SPA had not, however, ultimately been executed, Beef Holdings' fraud claims would fail because they are effectively allegations that Tyson entered into the Revised Proposal, an allegedly Type II Contract, "intending to breach that contract," which, "is insufficient to support a claim for fraud under New York law." *Marriott Int'l, Inc. v. Downtown Athletic Club of N.Y*, No.02 Civ. 3906, 2003 WL

21314056, at *6 (S.D.N.Y. June 9, 2003). There are three exceptions to this "general rule…that a fraud claim can not be based solely on allegations that a party did not intend to perform a contract." *Lam v. American Express Co.,* 265 F.Supp.2d 225, 230 (S.D.N.Y. 2003).

> To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

*Id.*

Beef Holdings does not argue that Tyson made promises or representations that created new obligations distinct from those it shouldered under the Revised Proposal, or that Tyson made fraudulent misrepresentations collateral or extraneous to the contract. *See PetEdge*, *Inc. v. Garg*, 234 F. Supp. 3d 477, 92 (S.D.N.Y. 2017) ("It is well-established that misrepresentations of a future intent to perform under a contract are neither collateral nor extraneous to the contract"). However, Beef Holdings does argue that it pleaded special damages caused by Tyson's misrepresentation, thereby protecting its fraud claims from dismissal. (Pl. Br. at 31). Specifically, Beef Holdings points to the Complaint's allegation that, as a result of Tyson's fraud, it "was induced to abandon negotiations with the Other Bidder to purchase Keystone's U.S. operations for up to $ 1.75. billion." (Compl. at ¶ 193); *See* (*Id.* at 33) (citing Compl. ¶¶ 193–202).

Special damages arise specifically from the alleged fraudulent misrepresentations and are not recoverable as contract damages. *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996); *Khodeir v. Sayyed*, 323 F.RD. 193, 203 (S.D.N.Y. 2017). In fraud actions, "in addition to out-of-pocket damages, plaintiffs may recover consequential damages for fraud claims which include 'the costs incurred in

preparing for, performing, or passing up other business opportunities.'" *E-Global Alliances, LLC v. Anderson*, 2011 WL 8879268, at *6 (S.D.N.Y. May 11, 2011) (quoting *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, 97 Civ. 4978, *11–12 (S.D.N.Y. June 17, 2002).

However, the special damages alleged must be supported. "[S]peculative and unsupported" lost opportunities will not suffice. *Lankau v. Luxoft Holding, Inc.*, 266 F. Supp. 3d 666, 676 (S.D.N.Y. 2017). Here, Beef Holdings alleges it lost the opportunity to *negotiate* further with the Other Bidder. (Compl. ¶ 200). Beef Holdings does not allege that the Other Bidder's offer to purchase Keystone's U.S. Holdings was concrete, let alone that the $1.75 billion purchase price was a settled, or even fully negotiated figure. In fact, earlier in the Complaint, Beef Holdings alleges that the Other Bidder "expressed a desire to buy Keystone's U.S. operations…at a price *between* $1.6 billion and $1.75 billion." (*Id.* ¶ 27) (emphasis added). The Other Bidder merely "appeared willing to pay up to $1.75 billion." (*Id.*) (emphasis added).

At most, Beef Holdings characterizes the Other Bidder as having "expressed an interest in" this purchase. (*Id.* ¶¶ 190, 200). The missed opportunity to negotiate further with a bidder whose offer amount was estimated and "anticipated" is not a concrete enough injury to plead special damages.

Beef Holdings' fraud claims are DISMISSED.

## C. Implied Covenant of Good Faith and Fair Dealing

Beef Holdings alleges Tyson breached its duty to act in good faith in preparing the Closing Statement "by exploiting the Purchase Price adjustment process in an attempt to radically reduce the Purchase Price by including purported adjustments that it knew

were not contemplated by the Closing Statement and that were based on facts and
information that Tyson was fully aware of prior to closing, when it agreed to the Base
Price and the Purchase Price adjustment process." (Compl. ¶¶ 179, 181). "It is axiomatic
that implicit in all contracts is a covenant of good faith and fair dealing in the course of
contract performance." *ARI and Co., Inc. v. Regent Intern. Corp.*, 273 F. Supp. 2d 518,
521 (S.D.N.Y. 2003) (citing *Dalton v. Educational Testing Serv.*, 663 N.E.2d 289, 291–
92 (1995)). The covenant's purpose "is to further an agreement by protecting a promise
against 'breach of the reasonable expectations and inferences derived from the
agreement.'" *Id.* at 522 (quoting *TVT Records and TVT Music, Inc. v. The Island Def Jam
Music Group*, 244 F.Supp.2d 263, 278 (S.D.N.Y.2003)).

However, "under New York law, breach of the implied duty of good faith is
considered a breach of the underlying contract," not an independent cause of action.
*Deutsche Bank Securities, Inc. v. Rhodes*, 578 F.Supp.2d 652, 664 (S.D.N.Y. Sept. 29,
2008 (S.D.N.Y. 2008). "New York law ... does not recognize a separate cause of action
for breach of the implied covenant of good faith and fair dealing when a breach of
contract claim, based on the same facts, is also pled." *Cordell v. McGraw-Hill Co., Inc.*,
2012 WL 5264844, at *4 (S.D.N.Y. Oct. 23, 2012) (quoting *Harris v. Provident Life &
Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir.2002)). Accordingly, to maintain a claim for
breach of the implied covenant, the claim must be premised on allegations distinct from
those "underlying the accompanying breach of contract claim." *Id.*

Beef Holdings' implied covenant allegations are substantially identical to its
breach of contract claims. The crux of the claim is that the purchase price adjustments
Beef Holdings disputes the legitimacy of in its breach of contract claims, were carried out

in bad faith. The improper purchase price adjustments underpin all these claims, which, as discussed above, belong before KPMG.

Beef Holdings' breach of implied covenant claim is DISMISSED.

## D. Declaratory Judgment

Beef Holdings' declaratory judgment claim asks the Court for a declaration as to the authority of Beef Holdings' positions in the above-cited causes of action. (Compl. at ¶¶ 204–19). As the Court has found to the contrary on these matters, Beef Holdings' declaratory judgment claim is appropriately DISMISSED at this stage.

## CONCLUSION

Tyson's motion to compel with respect to Counts I-IV and VI of the Complaint is GRANTED, and these claims are referred to KPMG for arbitration. "The FAA authorizes a district court to stay litigation pending arbitration. *See* 9 U.S.C. § 3. A stay is appropriate where the arbitration will resolve the adjustments at issue between the parties." *Severstal*, 865 F.Supp.2d at 444. Beef Holdings opposes arbitration, but not specifically the imposition of a stay in the event the motion to compel is granted. I find a stay to be appropriate here. Accordingly, this matter is stayed while the arbitration is pending.

Tyson's motion to dismiss is GRANTED with respect to Counts VII–X. The only remaining claim is Count V, alleging breach of contract related to the Target Working Capital adjustment category.

The parties should file a joint status report by April 21, 2021.

34

**SO ORDERED.**

Dated:  September 30, 2020
         New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**